We'll hear the next case, Purton v. United States. May it please the Court. My name is Brian Rosner, to my left is Natalie Napierala. We're counsel for the petitioner Robert Dupurton. We're here to ask that the Court reverse the Court below and grant Mr. Dupurton's petition for a writ of error, quorum nobis. Subsequent to pleading his prison sentence, facts were learned which shows that the facts upon which Mr. Dupurton was convicted were wrong and were the facts known earlier. There's a reasonable probability that the verdict at his trial would have been different. The issue at Mr. Dupurton's trial was his criminal intent. He was a coin merchant who sold coins to customers. As the judge made plain in its charge during the trial and after summations, Mr. Dupurton could only be convicted if it was shown, beyond a reasonable doubt, that he had an intent to cause financial harm to the people to whom he was selling coins. His defense was good faith, that he actually believed that he was selling coins at what they were worth. Needless to say, the prosecution position was absolutely the opposite, that he was intentionally selling grossly overvalued coins. Indeed, the theory of this case as it was tried, as it was summed up, as it was opened, was the great disparity theory. That there was such a great disparity between the value of the coins as shown by the defense expert witness, such a great disparity between what he testified to in his opinion and Mr. Dupurton's price, that there's no possibility that anybody could maintain an honest belief. You say the defense expert witness, you mean the government's expert witness. I'm sorry, I'm sorry. The government's expert witness, Mr. Swiatek. Because the defendant didn't call an expert witness, did he? Did the defendant, who is now the petitioner, he didn't call an expert witness. Did he contest the values testified to by the government's expert witness? No, he did. He did call an expert witness who testified that the values at which Mr. Dupurton sold the coins were the values that they were actually worth. He wasn't on the stand for as long as the government witness. I mean, the government witness was the key government witness. I think he occupied like ten percent of the trial transcript. But yes, the government, the defense did call an expert witness to give counter testimony to support the defense of good faith. How do you defend the proposition that it's an auction sale years later, is that right? An auction sale that realized substantially higher, very much higher prices than the values that were testified to by the government expert witness. How does that show, how does that establish that the government's evidence was false evidence? Again, I'm not sure if I would use false. I mean, I would just live with the word inaccurate. How does it establish that it was inaccurate? There were two boxes of Mr. Dupurton's coins at issue at this trial. One was the box of the coins sold to the customers who testified. The other box was the coins that were seized in his inventory for the purpose of, if he were convicted, they would be sold for restitution. Mr. Swiatek was the government valuation expert who opined as to the value of both boxes of coins. He gave his opinions at the same time, I think it was the year 2001, within weeks of each other. He applied the same standards and methodology. And frankly, he was looking at the same type of coins. They were numismatic coins, not bullion, which is valued based simply upon the weight of silver and gold, but numismatic, valued placed upon how scarce it is, what condition it's in. So the fact is that they, in effect, were the same type and kinds of coins. So the auction is a test of Mr. Swiatek's ability to basically opine in a manner that is accurate or not. But how many years passed between Swiatek's evaluation and the sale? Nine years passed between— Okay, so what I'm asking you is how does a sale nine years later at surprisingly higher prices than were testified due by Swiatek, how does it show, given the passage of nine years intervening, that the evaluation was seriously false, seriously wrong? I asked myself the same question. Auctions are mysterious. Sometimes auctions are hot. Very frequently one sees auctions in Sotheby's and Christie's where a work is sold for hugely more than the auction house estimated for that very auction. And one doesn't know why. And now you have nine years intervening. So what is your argument that the sale for much higher prices nine years later shows that the nine years earlier appraisal on which the jury relied, if that's what the jury relied on, was bad evidence, was wrong evidence? Judge LaValle, we did what any economist or historian would do. We adjusted for time. We adjusted for the rate of inflation. And we also adjusted for this—actually, there's an index maintained by one of the government's other coin witnesses of how coin prices have moved in time over the past decades. So when you adjust according to both that index and the rate of inflation, both of which incidentally show that there was a 23% increase in the price of numismatic coins during this time period, you can make an adjustment for what the auction price would have been had Mr. Swiatek's appraisal been correct nine years earlier. Now, this court in Romano said that Swiatek's methodology satisfies Rule 702 scrutiny. Correct? Judge Katzmann, with all due respect, we're talking apples and oranges. In Romano, you talked about methodology. You know, can you accept opinion testimony at a trial? And the answer to that is yes. We're not talking about methodology or opinion testimony or guesses as to value. We're talking about actual value of coins now. We know what the real value is, not what the opinion as to those values are. And in any case, between real value and opinion, real value trumps— I understand you to be saying that Swiatek just got it wrong. He just got it wrong. It's new evidence. He got it wrong based on the methodology that he used. And that methodology has been sanctioned by a court in another case. And you're saying that that has no bearing on this case. The methodology, yeah. But the result is that he got it wrong. And because he got it wrong, a person was convicted based upon evidence which was wrong. And had it been corrected historically in the past, it is likely that the jury would not have returned the verdict that it did because there would not have been evidence that Mr. DuPerdon had no basis to believe. Is that the standard? Is that the standard for a coram nobis? That it must be likely that the jury would have returned a verdict favorable to the defendant? The language which is used in Kovacs, which is actually the language which has been used in coram nobis cases going back decades. In fact, I've read some cases last night in which Judge Friendly uses the same language. The language is that if the new evidence creates a, quote, reasonable probability, end quote, of a different outcome. That's at page fifty-three of Kovacs. And actually, in Kovacs, the issue was that the defendant would have presented an affirmative defense and this court said the standard is, quote, that the defense likely would have succeeded at trial, close quote. And that was an affirmative defense which the defendant would have to prove, whereas honest belief is not an affirmative defense. It's merely something which the government must disprove beyond a reasonable doubt. Now, in this case, and correct me if I'm wrong, there was testimony from Mr. DuPerdon's employees saying that although they were told to tell the customers that coins had been graded by independent grading services, that DuPerdon was the one who graded all the coins. He assigned higher grades to coins that had been previously certified by independent graders and sold the coins for the higher price associated, connected with a higher grade. His employees understood that the grades and values of the coins that were being sold were substantially overstated. Sometimes DuPerdon cleaned the coins and lied about why coins were offered for sale below the market price for their putative grades. There were phony auctions that were staged to drive up the coins and to promise falsely that they would arrange for live auctions where those coins would be resold and purchased from DuPerdon. So there was a lot going on in this case, not just Sweatek's testimony or Montgomery's testimony, isn't that right? There was a lot going on, but the charge was that Mr. DuPerdon needed to have shown that he believed he was causing financial harm, and if there was no evidence that he did not believe in the value of the coins he was selling, or frankly, in light of the auction results, if the evidence is that his values were correct. I mean, the degree of error which is shown in the auction, the degree of error in Mr. Sweatek's testimony, matches early with his testimony at trial. He valued Mr. DuPerdon's coins at trial at 20 percent of what Mr. DuPerdon sold them for, and at the auction, adjusting for inflation and passage of time, he valued Mr. DuPerdon's coins at roughly 20 percent of what they actually sold for, not what the guesswork was, not what the opinion was, but what the real world said they sold for. So under those circumstances, yes, there was testimony that he took coins out and he regretted them. Well, actually, that was his testimony of guilt. He was the guy responsible for grading the coins and pricing the coins. As to the auction itself, what information is there about how the coins were sold, about the price points, the individual price points, to have a better sense of what actually happened at the auction? Well, to address that, Your Honor, this was your auction. This is the U.S. Marshal's auction that you've collectively have conducted or approved for all the years that you've sat on benches, and the U.S. Marshals arranged these auctions for the purpose of maximizing value so as to get the greatest number of dollars possible to redistribute to victims. So we just know that from beginning, and I somehow find it ironic that this criticism that we now have a test of the auction and the auction did exactly what we all have always wanted it to accomplish. Now, I did not put in more evidence of the auction at the hearing because I didn't think it was necessary. The government did not put in more evidence of the auction that they conducted and, by the way, paid $200,000 to conduct. I mean, this was really a professionally conducted auction. So, I mean, I know how the auction was conducted because I've seen all the sheets and everything else, but I just thought it was enough to put in the results since it was a government auction and, frankly, let the disparity in numbers speak for themselves. But, again, it was your auction. These are the kinds of auctions that the government conducts to maximize values, and it did its job. Your basis is a disparity. You really didn't make an inquiry into what actually happened at the auction, how it was conducted, what the individual price points might be. Yeah. I mean, all that stuff, the government, they could recover it if they wanted to. I mean, you have the pictures, you have everything else, you know, how the lots were divided up, how many days it took, et cetera, et cetera, et cetera. But, again, I did not think that was necessary to make the point because, in a way, I accepted the logic of the government's argument, which is that there's such a great disparity in price that we can draw an inference from it. But now we know what the real great disparity in price was, not between the opined values, which we now know to be wrong, but between the one real value that we have in this case. I mean, grading is subjective. The appraisals by Mr. Swiatek was subjective. The auction prices are real, real. And, indeed, it's the government's own witness, Mr. Montgomery, their grader, who actually refused to put a value on any of the coins. Of course, he said the only way to really know what they're worth is to go to the world, the real public world, and have an auction, which is what we did. So the fact is that, based on the facts we now know, it is reasonably probable that a jury would have accepted the good faith defense and not found proof beyond a reasonable doubt. Frankly, it is inconceivable how they could have found proof beyond a reasonable doubt. The coins were worth what they were being sold for. There was no evidence that Mr. Dupre had the intent to defraud. Thank you. Good afternoon, Your Honors. May it please the Court. I'm sorry. Paul Scotti for the government, with me at council table, is Joanne Navigas. Your Honors, quorum nobis relief is rarely granted and is reserved for only the most extraordinary of cases where a fundamental error has been established, has been proven, that invalidates the underlying proceedings, and that granting of the writ is necessary to achieve and required to achieve justice. The auction here, that is the sole premise upon which the petitioner relies, is completely unrelated and irrelevant to the overwhelming evidence that was presented at trial of the petitioner's guilt, including the overwhelming evidence of his intent to defraud. The auction itself, first of all, the coins at the auction itself were not evidence at the trial. They were not at issue at the trial. They were totally separate and apart from the coins that were presented as evidence that the petitioner overgraded and inflated the grades and thereby selling coins at inflated values. Second of all, the Can you explain that further? Yes, Your Honor. The coins that were sold at the auction were called inventory coins. They were 26,000 plus coins that were seized at the time of the defendant's arrest, but none of those coins were at issue in any of the counts in the indictment. There were about, I think, 702 coins that were at issue in the actual indictment that the government experts, both Mr. Montgomery and Mr. Swiatek, had examined and graded and that Mr. Swiatek had also placed a value on. But the coins that were auctioned off in 2010, none of them were at issue at trial. So that would be the first Because they focused on the trial coins are different from the inventory coins, is that your Yes, Your Honor. Yes, Your Honor. So the first point is that an auction of coins that were not related to the trial at all cannot be then used to undermine the evidence at trial. So you say that Swiatek rendered an opinion with respect to the value of 702 coins. Yes, Your Honor. And he testified that those coins were worth very substantially less. Were these coins that had been sold? Yes, Your Honor. These were coins that had been sold by the defendant. Yes, Your Honor. And Swiatek testified that they had a much smaller value than the value at which they had been sold by the defendant. Yes, Your Honor. Now, you say those 702 coins were simply not involved in the nine-year later auction? No, none of those coins were sold in the later auction. Did Swiatek express an opinion, any opinion with respect to the coins that were sold? Yes, Your Honor. And that is the basis, that is the premise upon which the petitioner's petition relies, is that after the trial, Mr. Swiatek was employed by the government to grade and appraise the inventory coins. After the trial? After the trial. Oh, I see. So this is a post-trial evaluation of the inventory. And at that trial, he rendered a value which turned out to be much, much lower than the nine-year later sale price. Yes, Your Honor. And in a government's position, it's that attenuated link that is saying that because of the price that it sold for in 2010, then it therefore proves that the methods of grading, which as this Court determined in Romano, it's the grade that determines the value. And so that therefore his methods of grading must have also been wrong. And in a further attenuated link, after the Romano case came out, the petitioner was then forced to now not just wrap these auction results around Mr. Swiatek, but also wrap them around Mr. Montgomery and say that because the auction, in the petitioner's estimation now, calls into question the methods of Mr. Swiatek, the problem there is that Mr. Swiatek and Mr. Montgomery, at trial, agreed on almost all of the grades of the inflated coins that were put in evidence. So now the attenuated link gets even further attenuated because the petitioner has to now discredit not just Mr. Swiatek, but Mr. Montgomery, because Mr. Montgomery's testimony was the overwhelming, was the predominant evidence at trial which established overgrading, inflated grading, and the grading was, as the Court said, was what the customer was bargaining for. The price is not the issue here. It's the grade and the value assigned. And the overwhelming evidence at trial was that the petitioner was grading the coins far above, grossly inflating the grades of the coins and, therefore, selling them at far higher values of the coins. What we have in 2010 is an auction that just gives us price, price that can be subjected to numerous different factors, not the least of which, while the petitioner talks about passage of time, not explaining it, and the increase in inflation. That indicates a steady and stable increase. That is not what the markets are, and that is certainly not what the markets were in 2010. 2010 was when this economy was coming out of its great, one of its most significant crises since the Great Depression. They were clearly volatile markets. The stock market had lost half of its value in the previous year, and investors went significantly from stocks and equities to commodities, things of value, things that were tangible, that weren't numbers on a computer screen that represented dollar amounts that could disappear in a day. That's why silver and gold skyrocketed between 2007 and 2011. The value of silver during that time went up 400 percent. The value of gold, 300 percent. And coins are a commodity. That clearly can at least give a reasonable explanation as to the price itself. But what the auction doesn't tell you, as Your Honor pointed out, is any kind of analysis to establish that the grades which assign the value were wrong. And information, as the petitioner said, the petitioner didn't dig deeper. Do you have records about how the coins were actually sold, what the individual price points were? We do, Your Honor. We have records from the Marshall Service. We don't know that we have all of the records related to this auction. It was in 2010, after all. And so we did obtain certain records from the Marshall Service with respect to the auction itself. But what I can tell the Court is that. . . And your adversary was saying he didn't request it because he didn't feel it was necessary because to him the case is based on disparity alone. Right. Looking at the difference in price. And, Your Honor, as this Court has held in Romano and as the district court at the time, and everyone agreed at the time, is that the massive disparity in the court, as the district court stated in denying its Rule 29 motion, the massive disparity was between the grade the coin customers anticipated receiving and what they actually received for the money, which clearly evinced the harm contemplated by the numis group defendants in their scheme to defraud. That's in the appendix under 49. The numis group defendants were all of the coin selling companies that were owned and operated by the petitioner. But what is the glaring omission from the petition, of which the petitioner has an extremely high burden to meet, is any type of grade analysis, any information as to, yes, the price may have been higher, but as I stated before, that could be related to the market circumstances. And, in fact, certainly that was a significant factor in the high price. But were the coins regraded before the auction? Who graded them? What were the grades? How did those grades compare to the grades of Mr. Swiatek previously? We don't have any of that information, Your Honor. And, in fact, that leads the more reasonable conclusion here to be that, as the court had pointed out before, auctions can be their own animal themselves. You can have particular buyers. If there was just one buyer out of all of them who wanted all of the coins and was willing to pay a higher amount, there's different factors that can explain it that are a lot more reasonable than finding as a matter of law. And as the petitioner states several times, looking at this auction as scientific proof, discrediting two well-established credentialed experts in the field of grading. And, again, these are people who have been established as experts over decades. Richard Montgomery was president of PCGS at the time of the trial. He's now president of NGC. Those are the two preeminent grading services in the country upon which the entire coin market relies upon. So to say that this auction now discredits, and that's the reasonable explanation, that it discredits the methods of Mr. Swiatek, who has also been in the coin industry since 1979, who has written books on grading, that the auction discredits him. And then by association, by mere association, because they agreed on the grades at the time of trial. I'm sorry. Had these inventory coins, had they been graded by the defendant, by deportant? Your Honor, I'm not aware of that. Again, they were seized, I believe, in a warehouse at the time of his arrest. I'm not certain as to that. They were, however, graded and valued by Mr. Swiatek for purposes of the auction itself that would ultimately later be held nine years. But I don't know if the court is wondering if there was a comparison between those inventory coins and Swiatek that could be made. I don't believe so, or if there was, I'm not aware of it. I haven't seen it in any of the records. But, Your Honor, I see my time is running out, and if there are no other questions. Obviously, for Coram Novus, it's an extraordinary relief that's being sought, and it can only be granted when it's the only recourse to achieve justice. Your Honors, justice was achieved the day that Mr. DuPertin was convicted. He was convicted, as the court pointed out, by overwhelming evidence that was not just the experts, but numerous witnesses that proved his deceitful practices over an extended period of time. And nothing in this auction or any other evidence has done anything to undermine his guilt. Thank you, Your Honors. There are consequences to all this, of course. I mean, you can see, don't you, under Funt, right, that there is the collateral consequence of his continuing disenfranchisement. Yes, Your Honor. The government does acknowledge that. However, there has been no fundamental error that's been proven. It comes nowhere close to establishing that. The auction, in reality, has nothing to do with what happened at trial. Thank you. Thank you, Your Honor. Thank you, Your Honor. Just to remind everyone that we presented the evidence of the auction at the petition. The evidence regarding the auction was not challenged by the government. It was not challenged by the court. And one of the dangers of sort of like trying to present new evidence, an oral argument, where, you know, Mr. Scottie is talking about, well, you know, maybe the market was going up at the time. We put in evidence of where the market was. At the appendix 192 to 193, we have the charts prepared by their expert, Mr. Montgomery. In fact, the coin market had plunged at the time of the auction from a prior height. Had the auction been conducted several months before, there probably would have been several hundred thousand dollars more gained at the auction. And as to what actually happened at this trial regarding the other evidence and whatever, this case was about valuation. That was what the case was about. Mr. Scottie has referred to grade. It's almost like he will concede that maybe there's a problem with value. But he says, well, there was testimony regarding grade. Mr. Montgomery said the grades were all wrong. But this really shows how Judge Spat really misunderstood the issue. Grade and value are, to use a poor expression, two sides of the same coin. The judge said it at trial. The government argued that in summation. Any coin, if it has a high grade, has a high value. If it's a low grade, it has a low value. To sort of suggest, as Mr. Scottie is now saying, well, maybe the coin really had a high value, but it really had a low grade, that's an impossibility. That doesn't occur. In fact, at trial, Judge Spat made it very plain that the only reason he let the case go to the jury was because of the valuation testimony. He says, and we quote it in our brief, he found this grading stuff very confusing, very perhaps arbitrary. But the values were clear. The difference between a seventy-seven and a seventy-four and how you distinguish between one and the other, that's not clear. But the fact is that the testimony from Swiotek was that the coin being sold by Mr. DePerdinant for $10,000 was only worth $2,000. He could understand that. And indeed, he said, well, it's because of that great disparity that the jury could find that these grades were wrongly stated. Or that the jury could find that there was an intent to defraud because of the great disparity. So that grade and valuation move up and down. It was all about value. I mean, the primary exhibit at trial, Exhibit 1300, it was a list of Swiotek's values compared to the sales prices. It was the exhibit most referred to in summation, most referred to with the witnesses back and back again. Mr. DePerdinant sold the coin at that value. Mr. Swiotek said it was only worth that. This case was about valuation. And if you believe that the auction says something about valuation, which would have created a reasonable possibility of a different outcome, and I don't see any other alternative, then this is precisely the kind of case for which the writ of quorum nobis should rarely be warranted. Thank you. Thank you both for your arguments. The Court will reserve decision. The final two cases are on submission. The Clerk will adjourn Court. The Court is adjourned.